IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION

| | | |
|---|---|---|
| UNDER SEAL | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No: _____ |
| v. | ) | |
| | ) | |
| UNDER SEAL | ) | |
| | ) | **DO NOT PLACE IN PRESS BOX** |
| Defendants. | **)** | **DO NOT ENTER ON PACER** |
| | ) | **DEMAND FOR JURY** |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA <br> ex rel. BRITTANY TUCKER, ASHLEY <br> DEWEESE, and BONNIE BROOKS | ) <br> ) <br> ) | |
| | ) | |
|    Plaintiffs, | ) <br> ) | Case No: _____ |
| v. | ) <br> ) | |
| AFFINITY HOSPICE HOLDINGS, <br> LLC | ) <br> ) | ) |
| | ) | |
|    Defendant. | ) <br> ) <br> ) | **DO NOT PLACE IN PRESS BOX** <br> **DO NOT ENTER ON PACER** <br> **DEMAND FOR JURY** |

## _QUI TAM_ COMPLAINT

Relators Brittany Tucker, Ashley Deweese, and Bonnie Brooks (collectively "Relators"), on behalf of themselves and the United States of America, allege and claim against Affinity Hospice Holdings, LLC ("Affinity" or "Defendant") as follows:

2

## JURISDICTION AND VENUE

1.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33 (the "False Claims Act").  Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.  Jurisdiction is also authorized under 31 U.S.C. § 3732(a).

2.      Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a), because Defendant qualifies to do business in the state of South Carolina, transacts substantial business in the state of South Carolina, transacts substantial business in this judicial district, and can be found here.

## PARTIES

3.      Defendant Affinity operates 13 hospice agencies throughout Alabama, Georgia, South Carolina, Arkansas, and Virginia.  Defendant Affinity is a Delaware Limited Liability Company and is headquartered at 135 Gemini Circle, Suite 202 in Birmingham, AL, 35209.  The hospice agencies operated by Defendant Affinity include Affinity Hospice Agencies in Greenville, South Carolina; Anderson, South Carolina; Cullman, Alabama; Madison, Alabama; Canton, Georgia; Rome, Georgia.  In 2021, private equity firm LLR Partners purchased a majority stake in Affinity.  Defendant Affinity is led by CEO Ray Shrout.

4.      Relator Brittany Tucker was employed as Director of Palliative Care by Affinity from August 2020 to November 2021.  In this role, Relator Tucker managed nurse practitioners and hospice medical directors employed by, or contracted with, Affinity.  Through this experience, Relator Tucker has knowledge of the fraud alleged herein, including Defendant's payment of illegal remuneration to nurse practitioners and medical directors to induce those medical providers to refer and admit patients to the Medicare Hospice Benefit.

5.      Relator Ashley DeWeese is a Registered Nurse and was employed as a Clinical Manager for the Affinity Hospice Agency in Cullman, Alabama from February 2023 until Relator DeWeese's retaliatory termination in violation of 31 U.S.C. § 3730(h) in July 2023.  In this role, Relator DeWeese witnessed the fraud alleged herein, including Affinity's systematic falsification of patient clinical information and Affinity's submission of false claims to the Medicare Hospice Benefit for ineligible, and non-terminal, hospice patients.

6.      Relator Bonnie Brooks is a licensed practical nurse and was employed as a Clinical Support Specialist at the Affinity Hospice Agency in Cullman, Alabama from January 16, 2023, until August 2023.  Through this role, Relator Brooks has knowledge of the fraud alleged herein, including Affinity's systematic enrollment and billing of ineligible, and non-terminal, hospice patients to the Medicare Hospice Benefit.

7.      Prior to filing this Complaint, Relators voluntarily disclosed to the United States the information upon which this action is based.  To the extent that any public disclosure has taken place as defined by 31 U.S.C. § 3730(e)(4)(A), Relators are the original source of the information for purposes of that section.   Alternatively, Relators have knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and Relators voluntarily provided that information to the Government before filing this Complaint.  Relators are serving contemporaneously herewith a statement of the material evidence in their possession upon which their claims are based.

## APPLICABLE LAW

### A.  THE FALSE CLAIMS ACT

8.      The federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who: (1) knowingly presents, or causes to be presented, a false or fraudulent

claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (3) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government; (4) knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government or (5) conspires to commit a violation of the False Claims Act is liable to the United States for a civil monetary penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104–410 [1]), plus treble damages.  31 U.S.C. § 3729(a)(1)(A), (B), (C), (G).

9.      Under the FCA, (1) the terms "knowing" and "knowingly" (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud.  31 U.S.C. § 3729(b)(1).

10.     The FCA defines the term "claim" as (A) any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.  31 U.S.C. § 3729(b)(2).

11.     The FCA defines the term "obligation" as—an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment. 31 U.S.C. § 3729(b)(3).

12.     If an entity makes a false or incorrect claim, it is required to report and return any overpayment.  42 U.S.C. § 1320a-7k(d).  Specifically, if a person has received an overpayment, the person shall report and return the overpayment within (60) days after the date the overpayment was identified or the date any corresponding cost report is due, if applicable.  *See* 42 U.S.C. § 1320a-7k(d)(1) and (2).

**B.  THE ANTI-KICKBACK STATUTE**

13.      Soon after the establishment of the Medicare system in 1965, it became apparent that the deep pockets of the national healthcare system were being abused through unethical and kickback-tainted referrals by unscrupulous physicians and medical entities.  In response, Congress enacted the federal Anti-Kickback Statute and made it a misdemeanor to provide "bribes and kickbacks" in exchange for referrals of Medicare funded medical services.  *See* Pub. L. No. 92-603, § 242(b), 86 Stat. 1329, 1419 (1972). As unethical and illegal referral patterns morphed and proliferated, Congress amended the Anti-Kickback Statute in 1977 to extend its reach beyond strictly "bribes and kickbacks" to "any remuneration" and elevated violation of the Anti-Kickback Statute from misdemeanor to felony status. *See* Medicare and Medicaid Anti-Fraud and Abuse Amendments of 1977, Pub. L. No. 95-142, 91 Stat. 1175 (1977).

14.     In 2010, Congress amended the Anti-Kickback Statute again to specifically provide that "a claim that includes items or services resulting from a violation of [the Anti-Kickback

Statute] constitutes a false or fraudulent claim for purposes of [the False Claims Act]." 42 U.S.C.

§1320a-7b(g).

15.     In part, the Anti-Kickback Statute provides as follows: (b) Illegal remunerations—

(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

(A)  in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B)  in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A)  to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B)  to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).

16.     A person need not have actual knowledge of the Anti-Kickback Statute or specific

intent to commit a violation of this section.  42 U.S.C. § 1320a-7b(h).

17.     Even if remuneration is paid, in part, for services rendered, if one purpose of

payment is to induce referral of items or services which may be paid for by federal health care

programs, the arrangement violates the Anti-Kickback Statute. *See United States v. Mallory*, 988

F.3d 730, 741 (4th Cir.) *cert. denied sub nom. Dent v. United States*, 142 S. Ct. 485, 211 L. Ed. 2d 294 (2021).

### C.  THE MEDICARE HOSPICE BENEFIT

18.     Through the Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq*., the United States provides health insurance coverage for eligible citizens.  The United States Department of Health and Human Services, specifically the Center for Medicare and Medicaid Services ("CMS") oversees the administration of Medicare.

19.     Through the Medicare Hospice Benefit, Medicare pays for hospice care for certain terminally ill patients who elect to receive such care.  *See* 42 U.S.C. § 1395d.  A patient is eligible for the Medicare Hospice Benefit if the patient is entitled to Medicare Part A benefits and is certified as being "terminally ill" in accordance with Medicare Hospice Benefit requirements. 42 C.F.R. § 418.20; 42 C.F.R. § 418.22.  A patient is deemed to be terminally ill if the patient "has a medical prognosis such that his or her life expectancy is 6 months or less if the disease runs its normal course."  42 C.F.R. § 418.3.

20.     The Medicare Hospice Benefit covers a broad set of palliative services for qualified beneficiaries who have a life expectancy of six months or less as determined by their physician. *See* 42 C.F.R. § 418.22.  Hospice is designed to provide pain relief, comfort, and emotional and spiritual support to patients with a terminal diagnosis.  Qualified hospice patients may receive skilled nursing services, medication for pain and symptom control, physical and occupational therapy, counseling, home health aide and homemaker services, short-term inpatient care, inpatient respite care, and other services for the palliation and management of the terminal illness.  *See* 42 C.F.R. § 418.202.

21.     In electing hospice care, a patient must agree to forego Medicare coverage for curative treatment.  *See* 42 U.S.C. § 1395d.

22.     Through Medicare and/or Medicaid (indirectly through the states), the United States reimburses hospice providers for services to qualified beneficiaries on a *per diem* rate for each day a qualified beneficiary is enrolled. 42 C.F.R. § 418.302.

23.     Medicare pays for four levels of hospice care: Routine Home Care, General Inpatient Care, Continuous Home Care, and Inpatient Respite Care.

24.     Routine Home Care is the most common level of hospice care and applies to any day a hospice beneficiary is at home and not receiving continuous home care.  General Inpatient Care is provided in a hospice inpatient unit, a hospital, or a skilled nursing facility (SNF) and is for pain control or symptom management that cannot be managed in other settings. Continuous Home Care is only allowed during brief periods of crises and only as necessary to maintain the individual at home.  Inpatient Respite Care is short-term inpatient care provided to the beneficiary when necessary to relieve the caregiver.

25.     Medicare or Medicaid makes a daily payment for Routine Home Care services, regardless of the number of services provided on a given day and even on days when no services are provided.

26.     The 2023 *per diem* payment rates for each level of hospice care are provided below:

| Level of Hospice Care | Final Fiscal Year 2023 Per Diem Payment Rates |
|---|---|
| Routine Home Care (first 60 days) | $211.34 |
| Routine Home Care (after 61st day) | $167.00 |
| Continuous Care | $1,522.04 |

| General Inpatient Care | $1,100.76 |
|---|---|
| Inpatient Respite Care | $492.10 |

**(i)   Requirements and Obligations of Hospice Medical Director, With Which Affinity Knowingly Did Not Comply, Causing False Claims.**

27.   A hospice facility must designate a physician as its medical director. 42 C.F.R. § 418.102.  The medical director must be a Doctor of Medicine or osteopathy who is an employee or is under contract with the hospice.  *Id.*

28.    The medical director has responsibility for the medical component of the hospice patient care program.  Further, Medicare requires specific responsibilities and obligations of hospice medical directors.  42 C.F.R. § 418.102.

29.   The medical director must review the clinical information for each hospice patient to determine whether the patient is terminally ill, such that the patient's life expectancy is 6 months or less if the illness runs its normal course.  42 U.S.C. § 418.22.

30.   In making the determination of whether a patient's life expectancy is 6 months or less if the disease runs its normal course, the hospice medical director must consider the following:

- the primary terminal condition;

- related diagnosis(es), if any;

- current subjective and objective medical findings;

- current medication and treatment orders; and

- information about the medical management of any of the patient's condition unrelated to the terminal illness.

42 C.F.R. § 418.102

10

31.     Upon considering these patient specific clinical factors, if the medical director concludes the clinical information and other documentation supports a medical determination that the patient's life expectancy is 6 months or less if the illness runs its normal course, then the medical director must complete and execute a certification so stating. This certification is referred to as an "certification of terminal illness," commonly referred to as a "CTI" or "COTI."

32.     "No one other than a medical doctor or doctor of osteopathy can certify or re-certify an individual as terminally ill."  Medicare Benefit Policy Manual, Chapter 9 § 20.1.

33.     Hospices "must obtain written certification of terminal illness for each [benefit period]" or period the patient is under hospice care.  42 C.F.R. § 418.22.  "The hospice must obtain the written certification before it submits a claim for payment." *Id.*  Accordingly, the COTI is provided to Medicare to certify that a patient meets the clinical criteria required to receive the Medicare Hospice Benefit.  Therefore, a valid COTI is a material condition of payment to bill Medicare for hospice services.  *See* 42 U.S.C. §1395f(a)(7) (payment for hospice services may be made "**only if**…the medical director or physician member of the interdisciplinary group of the hospice program certif[ies] in writing at the beginning of the period, that the individual is terminally ill.") (emphasis added)

34.     Additionally, the medical director's COTI must meet specific requirements. Specifically, the COTI must include:

▪     A statement that the patient's life expectancy is six months or less if the terminal illness runs its normal course;

▪     Clinical information and other documentation that support the medical prognosis.

▪     A brief narrative explanation of the clinical findings that supports a life expectancy of 6 months.  The narrative shall include a statement, directly above the Medical Director

signature, attesting that, by signing, the medical director confirms that he or she composed the narrative based on his/her review of the patient's medical record, or if applicable, his/her examination of the patient. The narrative must reflect the patient's individual clinical circumstances and cannot contain check boxes or standard language used for all patients.

　　　　42 C.F.R. § 418.22

35.　　　If a hospice patient is still alive after the first 90 days of hospice care, the patient enters another benefit period and may be re-evaluated for hospice eligibility by the medical director – who must again assess detailed patient-specific clinical information and other documentation to determine whether the patient's life expectancy continues to be six months or less if the illness runs its normal course.  If, upon considering all required factors, the medical director determines the patient's life expectancy continues to be six months or less if the illness runs its normal course, the medical director will complete and draft another COTI.  This COTI, or "recertification," must include all requirements listed *supra* and is a material condition of payment to bill Medicare for hospice services. 42 U.S.C. §1395f (payment for hospice services may be made "**only if**…the medical director or physician member of the interdisciplinary group of the hospice program recertif[ies] at the beginning of the period that the individual is terminally ill.") (emphasis added)

36.　　　Because the medical director has responsibility for the medical component of the hospice's patient care program, the medical director is required to perform "general supervisory services," as well as "participat[e] in the establishment of plans of care and services, periodic review and updating plans of care, and establishment of governing policies." 42 C.F.R. § 418.304(a).

37.     Medicare payment for these required medical director services is included in the hospice per diem rate. *Id.* Therefore, a hospice must have a medical director perform these services if billing Medicare for hospice services.  Otherwise, the hospice is billing Medicare for services that were not performed.

**(ii)     Certifications Required to Receive Payment for Medicare Services – Which Affinity Falsified.**

38.     To enroll as a Medicare provider, Defendant Affinity was required to submit a Medicare Enrollment Application for Institutional Providers.  *See* CMS Form 855A.  In submitting Form 855A, Defendant made the following "Certification Statement" to CMS:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

Form CMS-855A.

39.     Defendant Affinity then billed Medicare by submitting a claim form (CMS Form 1450) to the fiscal intermediary responsible for administering Medicare hospice claims on behalf of the United States. *See* CMS Form 1450.  Each time it submitted a claim to the United States through the fiscal intermediary, Defendant Affinity certified that the claim was true, correct, and complete, and complied with all Medicare laws and regulations.

40.     Relators' allegations that Defendant Affinity billed Medicare for hospice services provided to ineligible patients and billed Medicare for hospice services when failing to execute valid COTIs are "material" violations of Medicare Hospice Program conditions of payment and trigger False Claims Act liability. *See United States ex rel. Lemon v. Nurses To Go, Incorporated,*

924 F.3d 155, 163 (5th Cir., 2019); *See also Universal Health Services, Inc. v. U.S.,* 136 S. Ct. 1989, 1993 (S. Ct., 2016).

41.     Because Affinity intentionally pursues and enrolls hospice patients who are insured by Medicare, nearly all Affinity hospice patients are insured by Medicare and receive care under the Medicare Hospice Benefit.  For example, as of July 28, 2023, the Affinity Cullman, Alabama Agency had 58 patients enrolled in hospice care (known as the agency's "census") and 56 of these patients were insured by Medicare and enrolled in the Medicare Hospice Benefit.

42.      Defendant, like most Medicare hospice providers, bill Medicare for hospice services monthly.  When a patient has been enrolled in Affinity hospice services for the previous month, then Affinity submits one bill to Medicare for all hospice services provided in the previous month.

43.     Relators have knowledge that all Affinity Hospice Agencies' monthly bills and required documentation are submitted by the Affinity Billing Department (which is operated by Corporate Revenue Manager Sumer Mertes) to Medicare on the fifth day of each month.

44.     Accordingly, on the fifth day of each month, Defendants submitted or caused to be submitted CMS Form 1450 requesting payment for each patient that was enrolled with Affinity Hospice.  For many patients, Affinity knew these claims were false.

**<u>DEFENDANT'S FRAUDULENT SCHEMES</u>**

45.     Defendant Affinity defrauds the United States by submitting, or causing to be submitted, false or fraudulent claims to Medicare for hospice patients who are not terminally ill and thus ineligible for the Medicare Hospice Benefit.

46.     Moreover, Affinity offers and pays illegal remuneration in exchange for hospice patient referrals—in violation of the Anti-Kickback Statute.

47.     Defendant admits and retains ineligible hospice patients and bills the Medicare and Medicaid program for ineligible hospice patients through a variety of schemes, including:

- Using Affinity's corporate employees and corporate structure to manipulate clinicians and inappropriately admit patients to the Medicare Hospice Benefit;

- Paying illegal remuneration to Hospice Medical Directors and nurse practitioners to induce hospice referrals and induce false certifications of terminal illness;

- Falsifying and manipulating medical records to attempt to justify patient eligibility.

**I.     Defendant Affinity uses Affinity's corporate employees and corporate structure to manipulate and inappropriately admit patients to the Medicare Hospice Benefit.**

48.     Defendant Affinity sets aggressive, ever-increasing, goals for hospice admissions and census. These aggressive census goals and procedures are enforced on all Affinity agencies and therefore cause the submission of false claims throughout Affinity's agencies.

49.     To reach these census goals, Affinity engages in several aggressive and fraudulent schemes designed to ensure patients are admitted to hospice—regardless of patients' actual eligibility.

**A.  Defendant Affinity enrolls patients in Affinity's Palliative Care Program with the specific intent of "flipping" palliative care patients to the more profitable Medicare Hospice Benefit.**

50.     One troubling scheme is Affinity's strategy to "flip" or "convert" patients in its palliative care program to its hospice program.  Affinity informs its employees, including Relators, that the Affinity palliative program is simply a "holding program" for patients—until Affinity determines the patient should be transferred to the more profitable hospice program.

51.     Affinity is particularly aggressive in "flipping" patients from Palliative Care to the Medicare Hospice Benefit. Affinity goes so far as to impose specific requirements on how quickly Affinity clinicians must "flip" patients from Palliative Care to Hospice.  In October 2020, Relator

Tucker was instructed by Affinity Chief Operating Officer (COO) Leigh Nunn that Affinity's goal was to "flip" patients from Palliative Care to Hospice within 60 days of the patient choosing palliative care. Affinity's goal was enforced regardless of the patient's condition or the patient's willingness to forgo curative treatment.

52.     As of July 2023, Affinity shortened its stated goal to "flip" patients from palliative care to hospice care from 60 days to just 30 days after the patients' admission to Affinity's palliative care program.

53.     One way Affinity enforces this mandate is by refusing to pay nurse practitioners for more than four palliative patient visits—thereby pressuring its nurse practitioners to either convert the patient to hospice within four visits, or work without pay.

54.     Affinity's strategy to recruit palliative care patients and then "flip" the patients to hospice care is particularly troubling because of the differences between palliative care and hospice care. The critical difference is a patient who is receiving palliative care can still receive Medicare covered services designed to cure their illness.

55.     In contrast, when a patient elects to receive care under the Medicare Hospice Benefit, the patient can no longer receive "curative care"—or care designed to cure their illness. For example, a cancer patient could receive Medicare funded palliative care and could still receive Medicare funded chemotherapy designed to cure the cancer. However, when that cancer patient enrolls in hospice care, they give up the right to have Medicare pay for curative treatment such as chemotherapy.

56.     Critical to Defendant's scheme, Medicare also pays for palliative care and hospice care differently. Palliative care is typically reimbursed on a fee-for-service basis, meaning that a palliative services provider submits a separate charge for each service provided to the patient.

16

Whereas, for hospice care, providers submit per-diem bills for each day the patient is enrolled—regardless of whether the company provides any services on a given day. Therefore, because hospice companies typically do not provide services each day, companies make far more money under the Medicare Hospice Benefit's per diem structure than palliative care's fee-for-service.

57.     To coerce patients into giving up the curative care provided under the palliative care benefit and switch to the more profitable hospice care benefit, Affinity purposely withholds needed care from patients.

58.     Relator Tucker has witnessed Affinity medical directors including Dr. Abdul Odemuyiwa and Dr. S. Kwame Fiakpornoo consistently refuse to prescribe pain medication to Affinity palliative care patients. Moreover, Vice President of Intake Brandy Hamner and Chief Operating Officer Leigh Nunn use this reluctance to prescribe and manage patients pain medication as a tool to manipulate patients into giving up their right to curative care and enroll in hospice care.

59.     Specifically, when Relator Tucker raised concerns about palliative care patients not receiving adequate pain management services, Ms. Hamner and Ms. Nunn each stated, "if the patient's pain needs are that acute, then they need to be on hospice."

60.     Relator Tucker has witnessed that for patients who are "flipped" from palliative to hospice care, Affinity will then prescribe adequate pain medication once the patient is enrolled in hospice care.

61.     Indeed, many patients who are "flipped" from Affinity's palliative care program to hospice quickly revoke the election to the Medicare Hospice Benefit to receive curative care. This suggests that those patients are not actually terminally ill and therefore not inclined to resign to death.

62.     Relators have knowledge that many of the patients that are "flipped" from Affinity's palliative care to Affinity's Hospice Program are ineligible but through the schemes described herein, including paying nurse practitioners on a *quid pro quo* basis to refer patients, patients are callously and inappropriately admitted to the Medicare Hospice Benefit and forced to forgo curative treatment that could cure their illness.

63.     For example, on May 11, 2023, Patient B.P. was "flipped" from palliative care to hospice, despite Patient B.P. not being eligible for the Medicare Hospice Benefit.  Indeed, Affinity nurse Kimberly Kerber assessed Patient B.P. at the time of his hospice admission and determined that he was not eligible for hospice under either of Affinity's suggested terminal diagnoses: Chronic Obstructive Pulmonary Disease (COPD) or heart failure.  Ms. Kerber informed Affinity that Patient B.P. did not have a qualifying Palliative Performance Score (PPS) score for either of these diagnoses because he was still working as a farmer, riding his tractor, and tending to his farm.

64.     Nevertheless, pursuant to Affinity's scheme to "flip" palliative care patients to hospice, Affinity management insisted that Patient B.P. be admitted to hospice and was thereafter admitted to the Medicare Hospice Benefit on May 11, 2023.

**B. Affinity management overrules clinicians who determine that patients are not eligible for the Medicare Hospice Benefit.**

65.     Affinity utilizes institutional processes designed to ensure that ineligible patients are admitted and recertified to hospice care.  For instance, if clinical staff determines that a patient is ineligible for hospice and should not be admitted or should be discharged from hospice, the staff must then get permission from Affinity management to not admit or to discharge the patient.

66.     These Affinity management employees, or "C-Suite employees" include Vice President of Clinical Operations Haley Autry, Vice President of Intake Brandy Hamner and Chief

Operating Officer Leigh Nunn.  These "C-Suite employees" then invariably overrule the clinical staff and order the patient to be admitted or recertified to hospice care.  Even if the patient is clearly ineligible for hospice, Affinity Management will almost always find a reason to admit or recertify the patient, often telling the clinical staff that "just make it happen."

67.     Conversely, Affinity requires no supervisor approval from its management or anyone else when the clinical staff's initial determination is that a patient *should* be admitted or recertified to hospice.

68.     For example, on March 9, 2023, Relator Deweese went to perform an admission visit for Patient R.L.  Affinity instructed Relator Deweese that Patient R.L. should be admitted under a Heart Disease terminal diagnosis.  However, upon assessing Patient R.L., Relator Deweese determined that Patient R.L. was not terminally ill and not eligible for the Medicare Hospice Benefit.  Similarly, Affinity nurse Kelly Armstrong personally assessed Patient R.L. and was adamant that Patient R.L. was not terminally ill and not eligible under the Medicare Hospice Benefit.  Specifically, Patient R.L. did not qualify as terminally ill under a Heart Disease diagnosis because she had no symptoms of heart disease at rest, required no assistance for any of her activities of daily living, and Patient R.L.'s oxygen levels were consistently above 90%--even when Affinity nurses sought to exhaust Patient R.L. by making her walk throughout her house.

69.     Moreover, Patient R.L. was adamant that she did not want Hospice care, but still wanted to pursue curative treatment and see her cardiologist.

70.     However, pursuant to Affinity's institutional processes designed to admit inappropriate patients, Relator Deweese was required to call her supervisor, Clinical Vice President Haley Autry to get permission to not admit Patient R.L.  Without visiting the patient, Ms. Autry summarily overruled both Relator Deweese and Kelly Armstrong and ordered that

Patient R.L. be admitted to the Medicare Hospice Benefit on March 9, 2023. Patient R.L. was admitted under a Congestive Heart Failure diagnosis and Medical Director Dr. Howard signed a false COTI on March 17, 2023

71.     Thereafter, Affinity submitted false claims to Medicare for hospice services for Patient R.L. on April 5, 2023.

72.     Similarly, Affinity consistently instructs its clinicians to "document to the decline"—meaning that nurses and other clinicians should only document negative health information that makes the patients appear to be terminally ill while overlooking and not documenting information that, while true, would demonstrate the patient is not terminally ill.

73.     For example, on July 11, 2023, Cullman, Alabama Executive Director Rachel Steil instructed RN Case Manager Kimberly Kerber to go assess whether Patient T.C. was terminally ill under a liver failure diagnosis. From the outset, Ms. Steil's instructions were directed at making the patient appear eligible and not making an objective assessment of Patient T.C.'s condition. Specifically, Ms. Steil, who never visited Patient T.C., instructed Ms. Kerber to do a "note outlining decline, focusing on liver."

74.     However, after a 40–45-minute assessment of Patient T.C., Ms. Kerber relayed she believed that Patient T.C. is "more chronic than acute," because Patient T.C. did not exhibit any signs of jaundice nor signs of a "distended abdomen"—both of which would be expected in a patient with terminal-stage liver failure. Further, Ms. Kerber performed a "fluid wave test"— which was negative, also indicating that Patient T.C. does not have terminal-stage liver failure. Based on Ms. Kerber's 40-45 minute in-person assessment of Patient T.C., Ms. Kerber determined that Patient T.C. was not terminally ill.

75.     Yet, based on Affinity's institutionalized process, Ms. Kerber could not simply decline to admit Patient T.C. but had to continue to find ways to manipulate the documentation to make Patient T.C. appear eligible.  To try to do so, Ms. Kerber asked Executive Director Steil "would you like me to put the negative jaundice and negative fluid wave test in the note or not?"

76.     In response, on July 11, 2023, Ms. Steil instructed Ms. Kerber to refrain from documenting that Patient T.C. did not have jaundice and had a negative wave fluid test because this information would clearly show that Patient T.C. was not terminally ill and ineligible for the Medicare Hospice Benefit.  Instead, Ms. Steil instructed: "focus on the positive items that support liver disease and highlight those."

77.     However, even before Ms. Kerber could change her documentation to justify an admission for Patient T.C., Area Vice President Haley Autry interjected herself into the situation. Ms. Autry instructed Ms. Steil to have "favored nurse" Lori Hale go perform another admission assessment.  As discussed herein, Ms. Hale is one of Affinity's favored nurses and Ms. Autry knew that Ms. Hale would agree to do Affinity's bidding by admitting Patient T.C. and manipulating documentation to do so.

78.     Further, without ever seeing Patient T.C., Ms. Steil typed up a full admission note, not in the EMR system, but as a Microsoft Word Document to obfuscate the author and origin of this document.  This "admission note" was directly contrary to Ms. Kerber's documentation who just spent 45 minutes with the patient and determined Patient T.C. was not terminally ill.

79.     Ms. Steil then provided Ms. Hale with the Word document that Ms. Steil created for Patient T.C.'s admission note and asked Ms. Hale "since she always documented so well," if she would be willing to go do Patient T.C.'s readmission and use Ms. Steil's Word document as

21

the admission note.  As expected, Ms. Hale agreed to do so and went and re-admitted Patient T.C.—using Ms. Steil's document as the admission note—on the afternoon of July 11, 2023.

**C. Affinity selectively uses nurses who agree to admit ineligible hospice patients.**

80.     As identified *supra* regarding nurse Lori Hale and Patient T.C., Affinity selectively uses certain admission nurses who Affinity management knows will bend to Affinity's corporate pressure and admit ineligible patients.  Affinity specifically utilizes this strategy when one admission nurse has already determined that patient is inappropriate for the Medicare Hospice Benefit.  Refusing to take no for an answer, Affinity then sends one of its "favored nurses" who it knows will admit the patient regardless of eligibility.

81.     For example, Patient J.M. was found by Affinity nurse Victoria Scott to be ineligible for the Medicare Hospice Benefit on June 29, 2023.  Specifically, Ms. Scott stated "[Patient J.M.] is not hospice appropriate at this time.  He could benefit from home health with therapy…maybe we set him up with a home health that will flip him back to us when he is appropriate."

82.      However, just twelve days later, on July 11, 2023, Affinity North Alabama sales employee Didi Vardaman (who is paid for each hospice admission) informed the Affinity that she convinced Patient J.M.'s family that Patient J.M. could receive another evaluation.

83.     To ensure that Patient J.M. would be admitted this time, Ms. Vardaman specifically requested that Affinity admission nurse Brittany McGee be assigned to go assess Patient J.M. for admission.

84.     Relators have knowledge that Ms. McGee is one of Affinity's "favored nurses" and will admit the patient regardless of eligibility.  Thereafter, based on this scheme, Patient J.M. was admitted to the Madison, Alabama agency despite Affinity's knowledge that Patient J.M. was not

eligible for the Medicare Hospice Benefit. Affinity proceeded to falsely bill Medicare for J.M.'s care on August 5, 2023.

85.     As described *supra*, Relators have knowledge that Affinity nurse Lori Hale will agree to admit ineligible hospice patients and document false clinical information to support hospice admissions and recertifications.  As a result, Ms. Hale is a "favored nurse" and is sent by Affinity management, including Haley Autry, to perform admissions.  As a "favored nurse," Ms. Hale is frequently sent to re-assess patients who have already been found to be ineligible by other Affinity nurses because management knows Ms. Hale will admit ineligible patients.

**II.     Affinity violates the Anti-Kickback Statute by paying illegal remuneration to hospice medical directors and nurse practitioners to induce hospice referrals and induce false certification of terminal illness.**

**A.  Affinity Offers and Pays Illegal Remuneration to Nurse Practitioners to Refer and Admit Patients to the Palliative Care "Holding Program."**

86.  As part of its strategy to inappropriately "flip" Medicare funded palliative care patients to hospice care, Affinity offers and pays its nurse practitioners *quid pro quo* incentives to refer and admit patients to the palliative care "holding program" and then pays incentives for referring and admitting patients to the Medicare Hospice Benefit.

87.  First, Affinity illegally incentivizes nurse practitioners to admit patients to its palliative care program.  The palliative care referral incentives work as follows: If the nurse practitioner determines that the patient is appropriate for the palliative care program, Affinity pays the assessing nurse practitioner $425 for completing this admission visit.  However, if the nurse practitioner determines that the patient is not appropriate for palliative care, and the patient is not admitted, Affinity does not pay its nurse practitioners at all for this "non-admit" visit.

88.     Affinity pays nurse practitioners half of their palliative care admission payment, or $212.50, when the patient is enrolled in palliative care.  Affinity then pays the other $212.50 if the patient is still on palliative care at the end of the 90-day care episode.

89.     The amount of work required for a nurse practitioner to travel to a patient's home and complete a full assessment of the patient and their need for palliative care is generally the same regardless of whether the nurse practitioner ultimately determines the patient is appropriate for palliative care.  Therefore, Affinity's decision to pay a nurse practitioner only when the assessment results in a referral (and guaranteed admission) to palliative care is strictly to induce the nurse practitioner to refer the patient for admission.  Through their personal experience, Relators have knowledge that Affinity's goals are often accomplished.

90.     Indeed, based on Affinity's manipulative incentives, a nurse practitioner is often faced with scheduling, traveling, and completing a full assessment of a potential palliative care patient and if they determine the patient is not appropriate for palliative care they will not be paid whatsoever. But, if the nurse practitioner performs the same work but refers and admits the patient to palliative care, Affinity will pay the nurse practitioner $425.

**B. Affinity Offers and Pays Illegal Remuneration to Nurse Practitioners to Refer and Admit Patients to the Medicare Hospice Benefit.**

91.     Once Affinity has illegally incentivized nurse practitioners to admit a patient to palliative care, the patient is now in the Affinity care umbrella.  Affinity's inappropriate policies dictate that Affinity should then "flip" the patient to the more profitable Medicare Hospice Benefit within 30 days of admission to palliative care.

92.     Here too, Affinity injects illegal remuneration into the nurse practitioners' compensation to induce the referral and admission of patients to the Medicare Hospice Benefit.

93.     When "flipping" palliative patients to end-of-life hospice care, Affinity sends a nurse practitioner to assess the patient and determine whether the patient has a life expectancy of 6 months or less and thus eligible for the Medicare Hospice Benefit.   42 C.F.R. § 418.3.

94.     Relator Tucker has knowledge that Affinity executive Brandy Hamner provides nurse practitioners a bonus between $100-$175 when they refer a patient from palliative care and the patient is admitted to hospice.   These bonuses were not provided for performing services covered by Medicare; but were simply for making the referral and recommending admission to the Medicare Hospice Benefit.

95.     Relator Tucker has knowledge that multiple Affinity nurse practitioners complained of this illegal and manipulative pay structure.   Specifically, nurse practitioners Veronica Vante and Sherry Harper raised concerns about this policy.

96.     Relator Tucker repeatedly informed Affinity COO Leigh Nunn that paying nurse practitioners only when they admit patients implicated serious compliance concerns.   Specifically, on April 8, 2021, Relator Tucker informed Ms. Nunn via text message that the manipulative pay structure was causing nurse practitioners to resign, because "it is too much to see these patients and not get paid."

97.     Ms. Nunn consistently dismissed these concerns.   Affinity Chief Clinical Officer Dr. B.C. Farnham and Vice President of Clinical Operations Brandy Hamner also vehemently enforce this pay structure that improperly incentivizes nurse practitioners to admit patients to hospice.

98.     At times, if a nurse practitioner threatened to quit over Affinity's manipulative compensation structure, COO Nunn would agree to pay the nurse half the rate of an admission assessment for a non-admission assessment.

99.     Nevertheless, the policy was clear: if nurse practitioners wanted to be paid in full for assessment visits, they had to admit the patient.

**C. Affinity Pays Hospice Medical Directors Illegal Remuneration to Induce Referrals and False Certifications of Terminal Illness.**

100.    Affinity hires hospice medical directors only if they agree to be what Affinity refers to as a "preferred provider."

101.    To be a "preferred provider" the physician must agree to refer all possible hospice referrals exclusively to Affinity.  If a potential medical director refuses to agree to be a "preferred provider," Affinity refuses to hire them.

102.    This arrangement clearly violates the Anti-Kickback Statute because at least one purpose of Affinity's hiring and paying medical directors is to induce patient referrals. *See United States v. Mallory*, 988 F.3d 730, 741 (4th Cir*., 2021)*

103.    For example, Relator Tucker has knowledge that, in 2021, Affinity's Regional Vice President of Sales Andrea Simpson and Canton, Georgia Agency Executive Director Meredith Weatherington interviewed Dr. Tamim Kharrat for a medical director position at Affinity's Canton, Georgia agency.

104.    Dr. Kharrat is a pulmonologist practicing in Jasper, Georgia and treats patients with severe pulmonary diseases, including lung cancer and COPD.  Because of his patient population, Affinity believed that Dr. Kharrat would be a valuable referral source for hospice patients and sought to make him a hospice medical director for the Canton Agency.

105.    Before the interview, Ms. Simpson instructed Ms. Weatherington to question Dr. Kharrat about his hospice referral process and philosophy.  When Ms. Weatherington asked Dr. Kharrat about his approach to hospice referrals, Dr. Kharrat stated that he believed that patients should have the right to choose what hospice company best suited the patient and their families.

106.     Based on this belief, Dr. Kharrat stated that he would not exclusively refer patients to Affinity.  Further, Dr. Kharrat stated that if the patient did not already have a preferred hospice provider, then his practice is to provide the patient with three hospice companies as options and allow the patient and their family to choose which hospice provider best suited their needs.

107.     Allowing patients to freely choose a hospice provider was untenable to Affinity.  Because Dr. Kharrat refused to be a "preferred provider" and did not agree to exclusively refer or at least steer his patients to Affinity, Ms. Simpson refused to hire Dr. Kharrat for the medical director position.

108.     Conversely, Affinity Medical Director Dr. Raymond McCoy is the medical director of Affinity's Rome, Georgia agency and did agree to be a "preferred provider" and exclusively refer patients to Affinity for hospice services.  In exchange for Dr. McCoy's stream of referrals, Affinity pays Dr. McCoy a flat stipend of $2,800 per month.

109.     Dr. Neil Sinha is the Affinity Medical Director for Affinity's Jasper, Georgia and Canton, Georgia Agencies.[1]  Relators have knowledge that Affinity hired Dr. Sinha specifically because Dr. Sinha agreed to be a "preferred provider" and refer his patients to Affinity.   In exchange for Dr. Sinha's stream of referrals, Affinity pays Dr. Sinha a flat stipend of $4,000 per month.

110.     Demonstrating that Affinity pays its medical directors for referrals, rather than actual work performed, Affinity does not require medical directors to record or submit timesheets demonstrating how time they spent actually performing medical director services.  Instead, they are paid a flat rate each month.

---

[1] In or around 2021, the Jasper, Georgia Affinity Agency was consolidated with the Canton, Georgia Agency and now operates simply as the Canton Agency.

111.    After Dr. Sinha's referrals diminished, Affinity—at the order of COO Leigh Nunn—informed Dr. Sinha that to continue being paid by Affinity as a medical director, Dr. Sinha had to refer at least 80% of his hospice referrals to Affinity.  That same week Dr. Sinha referred two patients and has continued to refer hospice patients to Affinity in exchange for Medical Director payments.

112.    The following are representative examples of patients referred to Affinity by paid medical directors, in exchange for illegal remuneration and in violation of the Anti-Kickback Statute.

(a) Medicare Patient S.D. was referred to Affinity's Canton, Georgia agency by Medical Director Dr. Sinha on January 17, 2020 in exchange for illegal remuneration in the form of a $4,000 per month medical director stipend.  Acting as both the attending physician and hospice medical director, Dr. Sinha was the lone physician who certified Patient S.D. as eligible for the Medicare Hospice Benefit and executed a Certification of Terminal Illness on January 22, 2020.  Thereafter, including on or around February 5, 2020, Affinity billed false claims to Medicare for Patient S.D. for the daily rate of routine hospice care.  These claims were false because Patient S.D. was referred to Affinity Hospice by Dr. Sinha in exchange for illegal remuneration, in violation of the Anti-Kickback Statute.

(b) Medicare Patient W.F. was referred to Affinity's Canton, Georgia agency by Medical Director Dr. Sinha on December 3, 2021 in exchange for illegal remuneration in the form of a $4,000 per month medical director stipend.  On January 5, 2022, Affinity billed Medicare for nine days of hospice care provided to Patient W.F.  These claims

were false because these claims were tainted by the illegal remuneration paid to Dr.

Sinha in exchange for this referral.

**D. Defendant Affinity bills Medicare even though its medical directors do not exercise legitimate clinical judgment or perform medical director duties.**

113.    Another facet of Affinity's fraudulent scheme to submit false claims for hospice services is to remove medical decision making from its medical directors.

114.    One of Affinity's methods to remove medical director's medical judgment from the hospice certification process is to provide Affinity medical directors with false documentation and assessment information—thereby deceiving the medical directors into believing that patients are eligible.

115.    In addition, Affinity encourages its medical directors to simply sign whatever document or certification that Affinity provides—without reviewing or questioning the accuracy of the information or prognosis.

116.    At Interdisciplinary Team Meetings (IDT) meetings medical directors and the Interdisciplinary Team are required to discuss each patient's condition, review, and discuss each patient's terminal prognosis, and make a clinical determination whether each patient has less than six (6) months to live if the disease runs its normal course and is therefore eligible for the Medicare Hospice Benefit.  However, as Relators have witnessed on multiple occasions and in multiple agencies, this required process does not occur in Affinity IDT meetings.

117.    Upon her initial training on February 20, 2023, Relator Deweese was informed that, as clinical manager, she was expected to draft all COTI narrative statements for Affinity's Cullman, Alabama agency and provide these completed narrative statements to Medical Director Dr. Micah Howard to sign.  When Relator Deweese questioned this policy, she was told that the COTIs for the Cullman and Madison, Alabama offices were always written by either the clinical

manager or executive director—not the medical director.  This policy is in plain violation of Medicare Hospice Conditions of Payment. 42 C.F.R. § 418.22(b); 42 U.S.C. §1395f(a)(7).

118.    Relator Deweese's experience in Cullman IDT meetings similarly demonstrates that Dr. Howard does not actually exercise medical judgment to determine whether patients were terminally ill.  Instead, as encouraged by Affinity management including Area Vice President Haley Autry, Dr. Howard's goal is to simply re-certify patients regardless of whether they are terminally ill and eligible for the Medicare Hospice Benefit.

119.    Specifically, during a June 23, 2023 IDT meeting in the Cullman Office, Relator Deweese stated that Patient K.H. was not declining, was not terminally ill and recommended that the IDT team discharge this patient.

120.    Instead of reviewing clinical documentation or talking to other members of the IDT about whether Patient K.H. was terminally ill and eligible for the Medicare Hospice Program, Dr. Howard stated that this patient should not be discharged because he believed the patient needed help with personal care—even though the patient lived in a nursing home with around the clock care.  Specifically, Dr. Howard stated, "if not us, then who [would care for Patient K.H.]?"  Based solely on Dr. Howard's statement and without any clinical review, Patient K.H. was not discharged.

121.    Further, at the next IDT meeting on July 7, 2023, Patient K.H. was discussed again and acknowledged as not terminally ill.  But, instead of discharging the patient, Dr. Howard simply changed the patient's admitting diagnosis to try to justify Patient K.H.'s purported terminal illness.

122.    In Affinity's Rome, Georgia agency, Medical Director Dr. Raymond McCoy fails to perform required medical director duties and to exercise legitimate medical judgment in IDT meetings.  When Dr. McCoy attends IDT meetings, he does not offer any meaningful input, does

not review patient records, and does not engage in discussions related to patient care or patient eligibility.

123.    Rather, Dr. McCoy looks at one document on recertification—the nurse practitioner's most recent face-to-face report—and asks the loaded question regarding each patient up for recertification: "How are we keeping them on service?"

124.    Dr. McCoy does not write the required narrative statements that provide the medical basis upon which the patients are purportedly eligible for hospice care. Instead, Affinity non-physician staff draft the certification of terminal illness narrative statements and even falsify Dr. McCoy's signature on certifications of terminal illness.

125.    Certifications of terminal illness that are executed with no physician medical judgment of terminal status, no physician review, and no physician's narrative statement are not valid. *See* 42 C.F.R. § 418.22.  Accordingly, all claims submitted by Affinity to Medicare based on such certifications are fraudulent.  *See* 42 U.S.C. §1395f(a)(7)(A).

**III.    Defendant Affinity Perpetrates a Systematic Scheme to Falsify and Manipulate Medical Records to Justify False and Misleading Certifications of Terminal Illness.**

126.    To prevent Medicare from learning an ineligible patients' actual, non-terminal, condition, Affinity has implemented an institutionalized scheme to review and "correct" required documentation, including Certifications of Terminal Illness, to make patients appear eligible for government funded hospice care.  In other words, Affinity carefully reviews each patient's COTI and specifically identifies where ineligible patients' COTIs need to be falsified.

127.    To do so, compliance employees such as Barbara Fowler and Lana Kirkland compare COTI narrative statements and other patient documentation to the relevant Medicare Hospice Benefit eligibility requirements for the patient's diagnosis.  If the COTIs do not match

relevant Medicare eligibility requirements—thus demonstrating that the patient is not eligible for the Medicare Hospice Benefit—then Ms. Fowler and Ms. Kirkland flag the discrepancy between the patient's documented condition and eligibility requirements. These compliance department employees also note specifically why the patients' documentation demonstrates they are not eligible and what clinical documentation needs to be changed in order for the patients to appear eligible.

128.    Meanwhile, to prevent Medicare from learning that the flagged patients are ineligible, Affinity "holds" billing for these flagged patients until the identified COTIs are falsified so that the patient's documented condition comports with the precise language of relevant eligibility requirements.

129.    Compliance Department employees note all the Affinity hospice patients whose COTIs demonstrate that the patient does not meet Medicare criteria in a spreadsheet and sends this spreadsheet to Affinity management, including clinical managers such as Relator Deweese.  This email and spreadsheet are titled "CTI Holds."

130.    Thereafter, middle level managers such as Relator Deweese are instructed to falsify COTIs, other information, or do whatever is necessary to make the patients appear eligible.

131.    Often, there are numerous email exchanges between the compliance employees and management discussing how Affinity can change its clinicians' own documentation to falsely inform Medicare that the patient is eligible, and the claims should be paid.  After all patients listed on the monthly "CTI Holds" spreadsheet are "corrected," the newly falsified COTIs are then sent to the medical director for signature.

132.    As described herein, Affinity Medical Directors are instructed and incentivized to sign whatever documentation will allow Affinity to keep the patient on the Medicare Hospice Benefit.

133.    After the COTIs are falsified and signed, the Affinity compliance department, in conjunction with Affinity Revenue Manager Sumer Mertes, approves the billing of the patients who were previously flagged on the CTI Hold email.

134.    The approval of previously flagged patients for billing is discussed in email correspondence between Affinity corporate management and the agency-level managers and employees including Relator Deweese and Relator Brooks.

135.    Specifically, through this dialogue, Compliance employee Barbara Fowler informs Relators Deweese and Brooks that patients who were flagged as ineligible have been "corrected" and "released," or "approved to be released." This means that Affinity has approved and submitted the bills for the patients—thereby submitting or causing the submission of false claims.

136.    Because Affinity just went through the organized process of identifying ineligible patients, falsifying documentation to make the identified ineligible patients appear eligible, and then getting the physician to sign the falsified documentation, Affinity has clear knowledge that the patients who are flagged through this CTI Hold review are not eligible for the Medicare Hospice Benefit.

137.    For example, to be terminally ill and qualify for the Medicare Hospice Benefit under the primary diagnosis of atherosclerotic heart disease, Medicare requires that a patient have symptoms consistent with New York Heart Association (NYHA) Class IV classification which include "symptoms of heart failure at rest and any physical activity causes discomfort."  However, when Medicare Patient Z.J was initially assessed in December 2021 for admission to Affinity's

Cullman, Alabama hospice agency, the admission nurse documented that Patient Z.J. had heart failure symptoms consistent with NYHA Class III—making Patient Z.J. ineligible for the Medicare Hospice Benefit under a heart failure diagnosis.

138.    Pursuant to its scheme to falsify documentation, the Affinity "compliance team" recognized that the nurse's assessment of Patient Z.J. could draw scrutiny from Medicare auditors if Patient Z.J. was accurately described as having NYHA Class III symptoms in her Certification of Terminal Illness. Therefore, Affinity simply falsified Patient Z.J.'s admitting COTI and falsely reported that Patient Z.J. as meeting NYHA Class IV symptoms, to justify this ineligible admission.  On December 18, 2021. Cullman Medical Director Dr. Howard then signed the falsified COTI and admitted Patient Z.J. to the Affinity Cullman Alabama Agency.  This December 18, 2021 COTI was false because Affinity provided Dr. Howard with false medical findings, in violation of 42 C.F.R. § 418.102.

139.    Because Patient Z.J.'s initial COTI falsely reported her clinical status as being terminally ill, Patient Z.J. has not passed away but remains on Affinity's hospice rolls nearly two years after her fraudulent admission.  Indeed, as of July 2023, Affinity has documented Patient Z.J. as improved since her admission because Patient Z.J. is documented as being dependent in 4 out of 6 activities of daily living (ADL)—whereas upon admission she was documented as dependent for 5 of 6 ADLs upon admission in 2021.

140.    Further, the Affinity Compliance Team flagged Patient Z.J.'s March 31, 2023 COTI as "failed" the compliance review and "missing LCDs."  Relators have knowledge that this "missing LCDs" notation means that Patient Z.J.'s COTI did not specifically state that Patient Z.J. had symptoms consistent with the local coverage determination (LCD) qualifying language for heart disease.  Relator Deweese further has knowledge that as of March 31, 2023, Patient Z.J. still

did not qualify for the Medicare Hospice Benefit under a heart failure diagnosis and therefore her true condition was in fact inconsistent with the LCD for heart failure.

141.    Nevertheless, on April 5, 2023, Affinity—through revenue management employee Sumer Mertes—billed Medicare $4,426.10 for 31 days of routine home care for Patient Z.J.'s hospice services.

142.    Similarly, during the May 2023 CTI Holds review which demonstrated that patients were not actually eligible for Medicare funded hospice, compliance employee Barbara Fowler communicated with Cullman agency Executive Director Rachel Steil, Relator Deweese and supervisor North Alabama Clinical Vice President Haley Autry to determine how to manipulate and continue billing for ineligible patients.

143.    Two patients on the May "CTI Hold" were labeled as having a PPS of 50—which would demonstrate they were ineligible under their current COPD diagnosis.  These patients are D.B. and C.H.

144.    On May 29, 2023, Relator Deweese informed the compliance team that the Cullman IDG team responsible for Patient C.H.'s care agreed that Patient C.H. had a PPS score of 50%.  In this email exchange, Vice President of Compliance Elizabeth Pugh specifically reiterated that because both patients were classified as having a terminal diagnosis of COPD, the patients were not eligible because of their 50% PPS score but Affinity needed to document a 40% PPS score or lower to deceive Medicare approving payment for these patients.

145.    Faced with the IDG's decision that Patient C.H. was ineligible based on a PPS of 50%, on June 1, 2023, Regional Clinical Vice President Haley Autry instructed Relator Deweese to falsify the records by entering a "late entry" falsely stating that both Patient C.H. and D.B. were a 40% on the PPS scale.

146.     In so doing, Affinity—through Ms. Autry—caused the falsification of records material to a false claim and specifically overruled the IDG and medical director who unequivocally found Patient C.H. had a PPS of 50%.

147.     Thereafter, on or about June 5, 2023, Affinity—through Director of Revenue Sumer Mertes—billed Medicare for hospice services based on these knowingly false COTIs that were material to these false claims.

148.     Similarly, Affinity admission nurse Kimberly Kerber found Patient B.H. to have a PPS score of 50% on her initial admission visit.  However, Affinity management identified that Ms. Kerber's documentation demonstrated that Patient B.H. was not eligible and therefore, falsified that Patient B.H. had a PPS of 40% on her admission certifications, which were completed on April 3, 2023.  Thereafter, on May 5, 2023, Affinity submitted a false claim to Medicare for 30 days of routine home care hospice services provided to Patient B.H. based on Affinity's intentionally falsified documentation.

149.     On other occasions, if an ineligible patient's clinical condition cannot simply be altered to meet the Medicare requirements for a certain diagnosis (typically because it has already been altered to meet that diagnosis), Affinity changes the patient's diagnosis to justify its fraudulent billings.

150.     For instance, Medicare Patient D.A. was admitted to Affinity's Cullman, Alabama hospice agency on February 21, 2023 under the primary diagnosis of senile degeneration of the brain.  However, Patient D.A. plainly did not qualify for Medicare Hospice Services because even Affinity's documentation showed that Patient D.A. was a 6E on the FAST scale—when a 7A on the FAST scale is required to be eligible for a senile degeneration of the brain diagnosis.

151.    However, Patient D.A. was not even a 6E on the FAST scale because at this time Patient D.A. was still driving and remained employed and engaged at a business he owns.

152.    Patient D.A.'s ineligibility was first flagged during the February 2023 "CTI Hold" billing review and by Affinity compliance employee Becky Creel.  As of March 9, 2023, Ms. Creel manually held $1,448.88 in claims for eight days of hospice care from Patient D.A.'s admission on February 21 to February 28, 2023.  On March 9, 2023, Director of Revenue Management Sumer Mertes instructed the Affinity Cullman Agency, "please be sure that you notify Becky of anything that she can take off hold.  We need a push to get as much off hold as possible by close of business Tuesday."

153.    Based on this instruction, Relators Deweese and Brooks have knowledge that Affinity manipulated Patient D.A.'s documentation and on April 5, 2023, Affinity—through Director of Revenue Management Sumer Mertes—billed Medicare for $1,448.88 for these eight days of hospice care—despite knowledge that Patient D.A. was ineligible.

154.    Affinity's Compliance Department continued to flag Patient D.A. as ineligible for the Medicare Hospice Benefit, including in an email from Compliance employee Barbara Fowler on May 30, 2023, which stated "FAST remains 6E, which is not enough to qualify him. In my opinion he does not sound appropriate for [Senile Degeneration].  Can we look at changing the [primary diagnosis] to COPD for the documented 80s O2 STATS."

155.    In this May 30, 2023 email, Ms. Fowler acknowledged that that Patient D.A. was ineligible, and had been ineligible since his admission, but suggested simply changing Patient D.A.'s diagnosis to make him appear eligible.

156.    Despite Ms. Fowler and other management employees' documented knowledge that Patient D.A. was not eligible, Affinity did not refund any of the previously received federal

funds for Patient D.A.'s hospice care—including the $1,448.88 for eight days of hospice care from February 21 to February 28, 2023 that was billed on March 5, 2023.  By failing to refund this money, Affinity violated the reverse false claims provision of the FCA.  *See* 31 U.S.C. 3729(a)(1)(G).

157.    Moreover, as of May 30, 2023, Patient D.A. did not qualify for Medicare funded hospice care under a terminal stage COPD diagnosis either.  Contrary to Ms. Fowler's statement, Affinity did not have documented oxygen levels in the 80-percentile range.  Instead, all documentation showed Patient D.A.'s oxygen saturation readings were above 90%, which makes Patient D.A. ineligible under a COPD diagnosis.  Specifically, on a May 8, 2023, nursing visit, the nurse documented that Patient D.A. only has "shortness of breath with exertion"—which demonstrates the Patient D.A. does not have terminal stage COPD.

158.    Nevertheless, with full knowledge that Patient D.A. did not qualify under a COPD diagnosis, Affinity instructed Medical Director Dr. Marilyn Ligon to change Patient D.A.'s admitting diagnosis to COPD on a May 12, 2023 COTI.  Dr. Ligon signed this manipulated COTI, which was then submitted to Medicare and was material to payment of these claims.

159.    Based on this May 12, 2023 COTI—which falsely stated that Patient D.A. was terminally ill with COPD—Affinity thereafter billed Medicare for routine home care services provided to Patient D.A.  These billings were submitted to Medicare on June 5, 2023.

160.    In other instances, if Affinity determines that it cannot plausibly falsify a patient's documentation or change the patient's diagnosis, then Affinity instructs clinicians to vaguely note that the patient has had a "rapid decline"—which Affinity believes will justify Medicare payment for hospice services.

161.    For example, on May 23, 2023, Patient L.B. was flagged by Affinity Compliance Department employee Barbara Fowler as not eligible under a dementia diagnosis because she was listed as being a 6E on the FAST scale and having a PPS score of 50.

162.    On June 3, 2023, Relator Deweese informed Ms. Fowler that "[Affinity medical director] Dr. Howard has made updates to the CTI's for…Patient L.B." and asked, "will you please review and see if these can be cleared?"

163.    In response, Ms. Fowler stated "[Patient L.B.] is unqualified with a PPS of 50% and FAST at 6E and the current documentation."  Despite Affinity's clear knowledge that Patient L.B. is "unqualified," Area Vice President Haley Autry informed Ms. Fowler on June 8, 2023 that Patient L.B. "had a significant decline prior to admission" and this "Rapid Decline" justified Patient L.B.'s admission. However, Ms. Autry did not provide any clinical or verifiable data for this statement.

164.    Nevertheless, on June 8, 2023, Ms. Fowler stated that she would "release [billing] per Elizabeth [Pugh]…but only under rapid decline" Therefore, without any clinical justification, Ms. Pugh and Ms. Fowler approved billing Medicare for $3,205.08 for 18 days of care for Patient L.B.—when it was well-known that Patient L.B. did not qualify for these Medicare funded hospice services.

165.    Based on these discussions, Director of Revenue Management Sumer Mertes submitted the May 2023 billing for Patient L.B to Medicare on July 5, 2023.  This July 5 claim included 18 days of routine home care from May 14 to May 31, 2023 and was in the amount of $3,205.08.  Affinity had full knowledge that Patient L.B. did not qualify for the Medicare Hospice Benefit when it submitted these claims.

IV.     **Defendant Affinity has been directly informed of ongoing hospice fraud but continues to knowingly bill Medicare for false claims and retaliates against employees who raise concerns of fraud.**

166.     Defendant Affinity has full knowledge that many of its hospice patients are not terminally ill.

167.     Many of Affinity's clinicians, including Relators, have raised concerns about the admission of inappropriate patients.  In one example, Cullman, Alabama agency social worker Christopher Foster-Lloyd raised concerns about the non-terminal and ineligible patients throughout Affinity's hospice rolls.  Mr. Foster-Lloyd raised these concerns to Cullman Agency Executive Director Rachel Steil.

168.     Upon learning of Mr. Foster-Lloyd's complaints, Affinity management called Mr. Foster-Lloyd into a meeting on May 11, 2023.  This meeting was attended by Cullman Executive Director Rachel Steil and Affinity's "C-Suite Team."  During this meeting, Mr. Foster-Lloyd reiterated that he believed Affinity was systematically admitting inappropriate hospice patients.

169.     Instead of taking these complaints seriously and investigating Mr. Foster-Lloyd's complaints, the Affinity C-Suite Team and Executive Director Rachel Steil summarily terminated Mr. Foster-Lloyd on May 11, 2023 for voicing his opinion that Affinity was knowingly admitting ineligible patients.

170.     Similarly, Relator Deweese raised several compliance issues to Affinity management, most often raising concerns to Relator Deweese's supervisor Area Director of Clinical Operations Haley Autry.

171.     For example, upon her initial hire, Relator Deweese was resistant to drafting Dr. Howard's COTI Narrative Statements as instructed by Ms. Autry.  Yet, Ms. Autry continued to pressure Relator Deweese into drafting Dr. Howard's COTIs.

172.    Similarly, Relator Deweese routinely instructed nurses, including nurse Kim Kerber to accurately document a patient's condition by instructing nurses to "document what they see."  This instruction was directly contrary to Affinity's instructions to "document to the decline" and exclude information that could indicate that patients are not terminally ill.

173.    Further, Relator Deweese sought to prevent false claims by informing Affinity management that patients were not eligible and should not be admitted.  On March 9, 2023 Relator Deweese went to perform an admission visit for Patient R.L.  Upon assessing Patient R.L., Relator Deweese determined that Patient R.L. was not terminally ill and not eligible for the Medicare Hospice Benefit.  Similarly, Affinity nurse Kelly Armstrong personally assessed Patient R.L. and was adamant that Patient R.L. was not terminally ill and not eligible under the Medicare Hospice Benefit.  However, Relator Deweese then called her supervisor Ms. Autry, who instructed her to admit Patient R.L.—regardless of Relator Deweese and Ms. Armstrong's opinion that R.L. was not terminally ill.

174.    Based on Relator Deweese's protected activity of trying to prevent Patient R.L. and other ineligible patients from being admitted, she was soon ostracized, and her duties as clinical manager were shifted to Executive Director Rachel Steil—who is more than willing to perpetrate Affinity's fraud.

175.    Specifically, Affinity instructed Relator Deweese that Ms. Steil would now assign which nurses were performing admission visits.  Once Executive Director Steil gained this authority—which is within the scope of Clinical Manager duties—she scheduled "favored nurses" such as Lori Hale for significantly more admission assessments and specifically admission visits to patients who were expected to be ineligible for hospice.  Likewise, Ms. Steil decreased

admission visits to nurses such as Kimberly Kerber who, with Relator Deweese's support and instruction, documented patient conditions accurately and refuse to admit ineligible patients.

176.    Relator Deweese continued to raise concerns about ineligible patients and questionable referral practices.  Specifically, Relator Deweese raised concerns about Affinity accepting referrals from Dr. Neal Steil—who is married to Affinity Cullman, Alabama agency Executive Director Rachel Steil.

177.    Dr. Steil is a palliative care physician in Cullman, Alabama and Affinity believed Dr. Steil could be a strong referral source for hospice patients.  Indeed, Relators have knowledge that Dr. Steil's referrals were one reason that Affinity hired his wife, Rachel Steil to be Executive Director of the Cullman Agency.

178.    Moreover, Ms. Steil is paid incentives if the Cullman Agency meets its admission and census quotas.  Therefore, Ms. Steil received remuneration based directly on referrals made to Affinity by her husband Dr. Neal Steil.  Dr. Steil's referrals included: Medicare Patient T.C. (referred on March 23, 2023 and admitted on March 24, 2023) and Medicare Patient M.C. (referred on April 17, 2023 and admitted on April 18, 2023).

179.    As do all Affinity employees, Relator Deweese was required to complete compliance training through third-party health care compliance training platform Relias.  Relator Deweese's Relias training instructed her that accepting hospice referrals from a physician who has a family or financial relationship with Affinity employees could implicate the federal Anti-Kickback Statute and/or Stark Law.

180.    Because Affinity was routinely accepting referrals from the Executive Director's husband and developing business plans to increase referrals from Dr. Steil, Relator Deweese

reasonably believed that these referrals presented a violation of the Anti-Kickback Statute and/or the Stark Law.

181.    On April 18, 2023, Relator Deweese raised this issue to Ms. Autry, asking whether accepting referrals from Dr. Steil presented a "conflict of interest." Ms. Autry dismissed Relator Deweese's concerns and Affinity continued to pursue and accept referrals from Dr. Steil.

182.    Then, the final straw for Relator Deweese came when she was asked to do a review of all Cullman Agency patients who had been on the Medicare Hospice Benefit for over 180 days and assess their continued eligibility. In June 2023, Relator Deweese undertook a significant effort to objectively assess these patients and she opined that several of the patients who had been on hospice care for 180 days were not eligible for the Medicare Hospice Benefit and should be discharged.

183.    Affinity did not want Relator Deweese to actually recommend discharge, however. Instead, Affinity wanted Relator Deweese to either rubberstamp the patients' eligibility or instruct Affinity what documents need to be altered to create the illusion of eligibility. But, by opining that patients should be discharged, Relator Deweese had demonstrated that she was not willing to facilitate Affinity's fraud.

184.    In response, Affinity illegally retaliated against Relator Deweese. On July 17, 2023, Relator Deweese was in the Cullman Agency's conference room. Relator Deweese's supervisor Ms. Autry was also present and called Human Resources employee Bobby Houston, who informed Relator Deweese that she had been terminated from her employment with Affinity—effective immediately.

185.    Accordingly, because of Relator Deweese's actions of resisting drafting Dr. Howard's COTI Narratives in violation of 42 C.F.R. § 418.22(b), instructing nurses to document

patient conditions accurately, raising compliance concerns about the propriety of accepting referrals from Dr. Steil, and refusing to admit ineligible hospice patients, Affinity determined that Relator Deweese was impeding their fraudulent schemes.

186.    Affinity's reason for Relator Deweese's termination was pure pretext and demonstrates that Relator Deweese was terminated for her efforts to prevent false claims.

187.    Specifically, Relator Deweese was informed by Affinity Human Resources employee Bobby Houston that she was terminated due to the Cullman Agency was going through a "reduction in force."   However, no other Affinity employees, in the Cullman Agency or otherwise, were terminated at this time.

188.    Ms. Houston also informed Relator Deweese that the reason for the "reduction in force" was that the Cullman Agency was not meeting its census goals and therefore it could not support employing a full-time clinical manager.

189.    However, throughout Relator Deweese's tenure at Affinity, the Cullman Agency never failed to meet its aggressive census goals, thus demonstrating that reason for termination was patently false.

190.    Moreover, Relator Deweese has knowledge that on the day she was terminated, Affinity had an open Clinical Manager position in the nearby Madison, Alabama Agency. However, Ms. Houston falsely informed Relator Deweese that the Madison Agency Clinical Manager position was not available.

## COUNT ONE
## PRESENTING OR CAUSING TO BE PRESENTED FALSE CLAIMS UNDER 31 U.S.C. § 3729(a)(1)(A)

191.    Relators adopt and incorporate the paragraphs 1-190 as though fully set forth herein.

192.    By and through the fraudulent schemes described herein, Defendant Affinity knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims to the United States for payment or approval, to wit:

(a)    Defendant Affinity submitted, or caused to be submitted false claims for hospice care provided to patients who were not eligible or appropriate for the Medicare hospice benefit.

(b)    Defendant Affinity submitted, or caused to be submitted false claims for hospice care provided to patients who had not been certified by a physician as terminally ill, in violation of 42 U.S.C. §1395f(a)(7)(A).

(c)    Defendant Affinity submitted false claims for hospice care provided to patients whose COTI did not include a physician's narrative and with a false physician's signature, in violation of 42 U.S.C. §1395f(a)(7)(A).

(d)    Defendant Affinity submitted, or caused to be submitted, false claims for hospice services premised upon Defendant's fraudulent certifications of compliance with Medicare regulations as made on CMS Form 855A and CMS Form 1450, Certifications of Terminal Illness and elsewhere.

193.    The United States was unaware of the falsity or fraudulent nature of the claims described herein and paid claims it would not have paid but for Defendant's fraud.

194.    Defendant Affinity's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant Affinity and others by the United States through Medicare for such false or fraudulent claims.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States, and against Defendant Affinity, in an amount equal to treble the damages sustained by reason of

this Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

## COUNT TWO
## MAKING OR USING FALSE STATEMENTS OR RECORDS MATERIAL TO A FALSE CLAIM UNDER 31 U.S.C. § 3729(a)(1)(B)

195.    Relators adopt and incorporate paragraphs 1-190 as though fully set forth herein.

196.    By and through the fraudulent schemes described herein, Defendant Affinity knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit:

(a)    Defendant Affinity created and used false certifications of terminal illness and re-certifications of terminal illness and other false records intended to support its fraudulent billing to the United States, all in violation of 42 U.S.C. §1395f(a)(7)(A) and the Medicare regulations cited *supra*.

(b)    Defendant Affinity created and used fraudulently devised plans of care, thereby depriving patients of valid hospice care, in violation of 42 U.S.C. §1395f(a)(7)(B).

(c)    Defendant Affinity made false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare, including false certifications on CMS Forms 855A and 1450 as described *supra*, when Defendant was aware that its practices as described herein were in violation of Medicare payment prerequisites, including but not limited to 42 U.S.C. §1395f(a)(7)(A)(B).

197.    The false records or statements described herein were material to the false claims submitted, or caused to be submitted, by Defendant Affinity to the United States.

198.    In reliance upon this Defendant's false statements and records, the United States paid false claims that it would not have paid if not for those false statements and records.

199.    Defendant Affinity's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States for such false or fraudulent claims.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States, and against Defendant Affinity, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

### COUNT THREE
### FALSE CLAIMS BASED ON ANTI-KICKBACK STATUTE
### 31 U.S.C. § 3729(a)(1)(A); 42 U.S.C. § 1320a-7b(b)

200.    Relators adopt and incorporate paragraphs 1-190 as though fully set forth herein.

201.    By and through the fraudulent schemes described herein, Defendant Affinity knowingly—by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information—presented or caused to be presented false or fraudulent claims to the United States for payment or approval.

202.    By virtue of illegal remuneration (in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)) and submissions of non-reimbursable claims described above, Defendant knowingly presented or caused to be presented false or fraudulent claims for the improper payment or approval of hospice services when such services were procured through illegal remuneration disguised as payment for medical director services or payment for nurse practitioner services.

203.   Defendant Affinity hires and pays physicians to be medical directors based on their willingness to refer patients to Affinity.  Affinity hires only medical directors who agree to be "preferred providers" and to exclusively refer all their patients to Affinity.

204.   Defendant Affinity only pays nurse practitioners for assessment visits when the nurse practitioner admits the patient to palliative care or hospice care—thereby improperly inducing its nurse practitioners to refer or admit patient to Medicare funded palliative care and/or Medicare funded hospice care.

205.   The United States, unaware of the falsity or fraudulent nature of the claims that Defendant Affinity caused, paid for claims that otherwise would not have been allowed.

206.   Defendant Affinity's fraudulent actions have resulted in damage to the United States equal to the amount paid by the United States because of the Defendant's fraudulent claims.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States and against Defendant Affinity in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest and such other, different or further relief to which Relators may be entitled.

<u>**COUNT FOUR**</u>
<u>**CONSPIRACY UNDER 31 U.S.C. § 3729(a)(1)(C)**</u>

207.   Relators adopt and incorporate paragraphs 1-190 as though fully set forth herein.

208.   Defendant, together with its principals, agents, and employees, knowingly conspired to present or cause to be presented false or fraudulent claims to the United States for payment or approval, and knowingly conspired to make, use, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit:  Defendant knowingly admitted and certified

ineligible hospice patients, knowingly procured hospice patient referrals through illegal remuneration, and fraudulently certified and/or recertified hospice patients.

209.   The United States was unaware of the falsity or fraudulent nature of the claims described herein and paid claims it would not have paid but for the fraudulent actions of Defendant Affinity and its principals, agents, and employees.

210.   As a result of Defendant Affinity's fraudulent actions, together with the fraudulent actions of its principals, agents, and employees, the United States has suffered damage equal to the amount paid by the United States because of the Defendant Affinity's fraudulent claims.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States and against Defendant Affinity, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest, and such other, different, or further relief to which Relators may be entitled.

## COUNT FIVE
## "REVERSE FALSE CLAIMS" UNDER 31 U.S.C. § 3729(a)(1)(G)

211.   Relators adopt and incorporate paragraphs 1-190 as though fully set forth herein.

212.   By and through the fraudulent schemes described herein, Defendant Affinity knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States, to wit:  Defendant Affinity  knew that it had received hospice *per diem* payments for patients who were ineligible to receive hospice care or not properly certified to receive hospice care, yet Defendant Affinity took no action to satisfy its obligations to the United

States to repay or refund those payments and instead retained the funds and continued to bill the United States.

213.   As a result of Defendant Affinity's fraudulent conduct, the United States has suffered damage in the amount of funds that belong to the United States but are improperly retained by Defendant Affinity.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States, and against Defendant Affinity, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

## COUNT SIX
## RETALIATION UNDER 31 U.S.C. 3730(h)(1)

214.   Relator Deweese adopts and incorporates paragraphs 1-190 as though fully set forth herein.

215.   Defendant Affinity knowingly threatened, harassed, discriminated against and discharged Relator Deweese because of lawful acts done by Relator Deweese in an effort to stop or prevent violations of the False Claims Act.

216.   As a result of Defendant's retaliatory conduct, Relator Deweese has suffered damages of extended periods of lost pay, irreparable harm to her personal and professional reputation, undue hardship forced upon Relator Deweese and her family, and extended infliction of emotional distress upon Relator Deweese and her family.

WHEREFORE, Relator Deweese demands judgment in her favor and against Defendant, in an amount of two times the amount of back-pay accrued since Relator Deweese's termination, interest on that back-pay, and compensation for special damages caused by

Defendant's discrimination, including litigation costs and attorneys' fees as permitted by 31 U.S.C.

§ 3730(h)(2).

September 15, 2023

          _s/Ashley White Creech_
          Ashley White Creech #10346
          McGowan Hood Felder Phillips, LLC
          1539 Health Care Drive
          Rock Hill, SC 29732
          (803) 327-7800
          (803) 328-5656 (fax)
          acreech@mcgowanhood.com

          BENJAMIN P. BUCY (GA Bar No.: 526064)(*pro hac vice* to follow)
          BARRASSO USDIN KUPPERMAN FREEMAN & SARVER, L.L.C.
          100 Main Street
          Saint Simons Island, Georgia 31522
          Tel:   205.933.4006
          Fax:   205.933.4008
          Email:bbucy@barrassousdin.com

          **Attorneys for Relators**

## Certificate of Service

On this the 15 day of September 2023, Relator hereby certifies that in compliance with Rule 4 of the Federal Rules of Civil Procedure, service of this *Qui Tam* Complaint has been executed as follows:

**By Certified Mail to:**

United States Attorney for the District of South Carolina
Attn: Assistant United States Attorney Beth Warren
1441 Main Street Suite 500
Columbia, SC 29201

**By Certified Mail to:**

Attorney General of the United States of America
Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

*/s/ Benjamin P. Bucy*